UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Felipe Accioly Vieira,

        Plaintiff,

    v.                             Civil Action No. 2:17–cv–160-jmc

Anthony Korda,
The Korda Law Firm,

        Defendants.

## OPINION AND ORDER
(Doc. 6)

On August 25, 2017, Plaintiff Felipe Accioly Vieira filed the present civil action

in this Court, bringing seven counts against Defendants Anthony Korda, Esq., and the

Korda Law Firm (the Firm).  (Doc. 1 at 10–18, ¶¶ 66–111.)  The gravamen of these

claims is that Korda and his law firm failed to adequately represent and advise Vieira

while he sought, under the EB-5 Immigrant Investor Program administered by U.S.

Citizenship and Immigration Services (USCIS), to secure permanent residency in the

United States by investing in Jay Peak in Jay, Vermont.  (*See generally* Doc. 1.)  Based

on these purported failures, Vieira seeks total damages in excess of $2,000,000 and

such other relief as this Court deems proper.  (*Id.* at 18, ¶ 9.)

Presently before the Court is a Motion to Dismiss Case for Lack of Jurisdiction

jointly filed by Korda and the Firm pursuant to Fed. R. Civ. P. 12(b)(2).  (Doc. 6.)  In

their Motion, Korda and the Firm argue that this Court lacks personal jurisdiction

because Korda "practices federal immigration law, handled outside of Vermont,

without reference to Vermont law" and because Korda's representation of Vieira was limited to preparing Vieira's EB-5 application. (*Id.* at 3.) Vieira opposes the Motion, asserting that all aspects of Vieira's representation involved Vermont and that Korda benefited from an ongoing business relationship with Jay Peak. (Doc. 17 at 1–2.)

Concluding that Vieira's Complaint fails to plausibly allege that Korda and the Firm had sufficient contacts with Vermont, this Court lacks personal jurisdiction over Korda and the Firm. Rather than dismissing the action without prejudice, however, the Court concludes that the interests of justice warrant transfer of this case; thus, Defendants' Motion to Dismiss for Lack of Jurisdiction (Doc. 6) is DENIED and the Clerk of Court shall TRANSFER this case to the United States District Court for the Middle District of Florida.

## **Factual Background**

The following background is drawn from the allegations in Vieira's Complaint (Doc. 1), the Motion to Dismiss Case for Lack of Jurisdiction jointly filed by Korda and the Firm (Doc. 6), the parties' responses to this Motion (Docs. 17, 23), and the documents and affidavits accompanying the parties' filings. (Docs. 6-1–6-3; Docs. 17-4–17-21); *see Whitaker v. Am. Telecasting, Inc.*, 261 F.3d 196, 208 (2d Cir. 2001) (stating that personal jurisdiction may be established through the plaintiff's "own affidavits and supporting materials" (internal quotation marks omitted)). For the purposes of deciding a Rule 12(b)(2) motion on affidavits and accompanying documents, the Court construes the allegations in the light most favorable to Vieira and resolves all doubts in his favor. *Id.* (internal quotation marks omitted).

## I.    Relevant Persons and Companies

Plaintiff Vieira resides in Stowe, Vermont; prior to his conditional immigration to the United States, he was a resident of Brazil.  (Doc. 1 at 1, ¶ 1; Doc. 17-12 at 4.)

Defendant Korda is a resident of Naples, Florida,[1] and is licensed to practice law in California.  (Doc. 1 at 1, ¶¶ 2, 3; Doc. 6-1 at 1, ¶ 2.)  At all relevant times, Korda was the President of the Firm,[2] which has its principal place of business in Naples, Florida, and an office in Beverly Hills, California.  (Doc. 1 at 1, ¶¶ 3, 4; Doc. 6-1 at 1, ¶ 1.)  Korda and the Firm provide legal services related to federal immigration law, including the EB-5 Immigrant Investor Program, which is discussed in detail below. (Doc. 1 at 2, ¶¶ 11–12; Doc. 6-1 at 1, ¶ 3.)  Neither Korda nor the Firm advertise or solicit work in Vermont.  (Doc. 6-1 at 1, ¶ 4.)

William Stenger is the former CEO and President of Jay Peak.  (Doc. 1 at 3, ¶ 17.)  In this capacity, Stenger oversaw a number of EB-5 immigrant investor programs at Jay Peak, (*id.*), including Jay Peak Hotel Suites Stateside, L.P. (the Jay Peak Project), the project that Vieira ultimately invested in as part of the EB-5 Immigrant Investor Program.  (*Id*. at 3–4, ¶ 21.)

## II.    EB-5 Immigrant Investor Program

Under the EB-5 Immigrant Investor Program, a foreign entrepreneur who makes a capital investment in the United States can receive a permanent U.S. visa.

---

[1] Korda was originally a resident of England, (Doc. 17-5); he gained his permanent residency by investing in an early stage of Jay Peak and participating in the EB-5 Immigrant Investor Program. (*Id.*; Doc. 1 at 3, ¶ 19.)

[2] The Firm is a successor in interest to Korda, Zitt & Associates, which was the name of the firm at the time the alleged events occurred.  (Doc. 1 at 1, ¶ 4; Doc. 6 at 1 n.1.)

(*Id.* at 2, ¶ 12.)  To apply, an entrepreneur must first file a Form I-526, entitled "Immigrant Petition by Alien Entrepreneur," with USCIS.  (*Id.* at 2–3, ¶ 13); 8 C.F.R. § 204.6(a).  In the I-526 Petition, the entrepreneur must show, with supporting documentation, that the entrepreneur has either invested capital in or is in the process of investing capital in a new commercial enterprise in the United States that will create at least 10 full-time jobs for qualified workers.  (Doc. 1 at 2–3, ¶¶ 12–14); 8 C.F.R. § 204.6(j).  In most cases, the entrepreneur's investment is administered by a specific regional center, which is designated by USCIS.  (Doc. 1 at 2, ¶ 12); 8 C.F.R. § 204.6(j), (m)(3).  If USCIS approves the I-526 Petition, the entrepreneur and his dependent family members are eligible for conditional permanent residency in the United States.  (Doc. 1 at 2–3, ¶ 13.)

After two years, to gain permanent residency, the entrepreneur must submit a Form I-829, Petition by Entrepreneur to Remove Conditions on Permanent Resident Status.  *See* 8 C.F.R. § 216.6; (*see also* Doc. 17-14.)  If the foreign entrepreneur's investment satisfies the commercial enterprise and job-creation requirements, 8 C.F.R. § 216.6(c)(1)(i)–(iv), USCIS will grant the Form I-829 Petition and the immigrant investor is eligible to permanently live and work in the United States.  *Id.* § 216.6(d)(1); (Doc. 1 at 3, ¶ 15.)

## III.  **Vieira's Investment in the Jay Peak Project and I-526 Petition**

In February 2012, after discussions with Stenger, Vieira preliminarily decided to invest in the Jay Peak Project as a means of securing his U.S. immigration through the EB-5 Program.  (*Id.* ¶ 17.)  To this end, Vieira asked Stenger to recommend attorneys familiar with the EB-5 process.  (*Id.*)  Rather than providing a list of

attorneys, in a February 24, 2012 email, Stenger recommended Korda as a "very good [EB]-5 lawyer" who "knows Jay Peak . . . very well."  (Doc. 17-7; *see also* Doc. 1 at 3, ¶ 18.)

On the same day—February 24, 2012—Korda emailed Vieira to offer his services as an "Immigration Attorney focusing on EB 5 cases" who has "filed numerous I-526 petitions for clients, many of whom . . . invested in Jay Peak projects."[3]  (Doc. 17-8.)  Four days later, on February 28, Korda followed up with Vieira, again noting that he had "worked with Jay Peak on many successful applications" and offering a discounted service to Vieira because Jay Peak was "kind enough to refer clients to [him.]"  (Doc. 17-9.)  Further, Korda stated that, if Vieira decided to invest in a project other than Jay Peak, he could "assist with due diligence" and provide "advice about projects . . . to be wary of."  (*Id.*)  Finally, Korda noted that, "[g]iven the nature of the EB-5 practice," most of his clients were not located in Naples and this caused "no logistical difficulties" with filing and preparing documents.  (*Id.*)

Korda's entreaties persuaded Vieira and, on March 5, 2012, Vieira and Korda executed a document entitled "Fee Agreement for Legal Services" (the Agreement). (Doc. 1 at 3–4, ¶ 21; *see generally* Doc. 6-2.)  At the time Korda and Vieira entered into the contract, Vieira was a resident of Brazil and Korda was a resident of Florida. (Doc. 6-1 at 1, ¶ 8; Doc. 17-12 at 4.)

---

[3] This was not the first time that Korda emailed Vieira.  In a March 29, 2010 email, Korda reached out to Vieira with a similar offer of representation that touted Korda's EB-5 experience and his familiarity with Jay Peak.  (*See generally* Doc. 17-5.)  Apparently, Vieira responded to this email and asked a question regarding tax returns, (Doc. 17-6 at 2), but nothing further developed from this initial communication.

The parties' Agreement provided that "[a] Client who enters this Fee Agreement for Legal Services is certifying and does hereby certify . . . that he or she has reached a firm and final decision to invest in [the Jay Peak Project] independently of any representations made by . . . the Firm." (Doc. 6-2 at 1.) Further, by signing the Agreement, Vieira authorized Korda and the Firm to communicate with Jay Peak to facilitate the preparation of the I-526 Petition. (*Id.*) The Agreement also defined the scope of Korda's services, limiting Korda's representation to the "preparation and filing of the I-526, Immigrant Petition by Alien Entrepreneur" and any initial collateral applications. (Doc. 6-2 at 3.) Beyond the preparation of the I-526 Petition, the contract specified that "[n]o other legal services" would be provided. (*Id.*) In particular, the contract indicated that Korda's services did not include "[m]otions to [r]e[]consider any denial of a petition or application" or "[a]dvice upon or the filing of an application to remove conditions of lawful permanent residence." (*Id.*) Notably, the Agreement did not require Korda to prepare and file the second immigration form required for Vieira to gain permanent residency under the EB-5 program: a Form I-829, or Petition by Entrepreneur to Remove Conditions on Permanent Resident Status. (*Id.*); *see also* 8 C.F.R. § 216.6. Similarly, the Agreement did not require Korda to perform a due diligence inquiry on the Jay Peak Project, nor did the contract require Korda to make the actual investment in the Jay Peak Project on behalf of Vieira. Finally, the Agreement set a flat fee for Korda's preparation of the I-526 Petition, (*id.* at 4–5), and indicated that the contract would be "governed by the laws of the State of Florida, U.S.A." (*Id.* at 6.)

On March 9, 2012, as the initial payment for Korda's services, Vieira sent a cashier's check from the People's United Bank branch located in Stowe, Vermont to Korda in Florida.  (Doc. 17-11; Doc. 17 at 7.)  Although Vieira still resided in Brazil at this time, Vieira had specifically set up a bank account with People's United to make monetary transfers to the Jay Peak Project easier.  (Doc. 17-10.)

During the same approximate time period that Vieira engaged Korda, in late February and early March 2012, Vieira became concerned with the allocation of investor funds for the Jay Peak Project.  (Doc. 1 at 4, ¶ 25.)  In particular, on February 28, 2012, Rapid USA Visas—a third-party EB-5 consulting company—terminated its relationship with Jay Peak because "Rapid USA no longer [had] confidence in the accuracy of representations made by Jay Peak . . . or in the financial status of and disclosures made by the various limited partnerships."  (Doc. 17-20 at 2.)  When Vieira confronted Stenger regarding Rapid USA's actions, Stenger purportedly "downplayed the problems raised by Rapid USA" and stated that the issues surrounding Rapid USA were merely a "business dispute."  (Doc. 1 at 4, ¶ 26.)

Unsatisfied with Stenger's response, (*id.* ¶ 27), in early March 2012, Vieira sought advice from Korda regarding Rapid USA and his EB-5 investment.[4]  (*Id.* at 5, ¶ 31.)  On March 1, 2012, Korda emailed Vieira indicating that the issues between Jay Peak and Rapid USA were recent and that Jay Peak was "in the process of reorganizing their investor liaison."  (Doc. 17-14 at 6.)  Korda further reassured Vieira

---

[4]  Apparently Vieira also contacted James Candido, the Director of the Vermont Regional Center authorized under the EB-5 program.  (Doc. 1 at 4, ¶ 28.)  According to Vieira, Candido telephoned Vieira and explained that the issues between Jay Peak and Rapid USA involved a "business dispute."  (*Id.* at 5, ¶¶ 29–30.)

that he had "emailed and ask[ed] that someone contact[] you as soon as possible as you are anxious to start the process." (*Id.*) On March 9, 2012,[5] Korda sent another email stating that he had "absolutely no information" about the disagreement between Rapid USA and Jay Peak but he speculated that it involved a "business fallout." (Doc. 17-15.) Korda also wrote that he had "no inside knowledge and so [could not] allay [Vieira's] concerns," but he offered to work with any regional center project that Vieira chose. (*Id.*) Vieira now claims that Korda did, in fact, have specific knowledge regarding the issues between Rapid USA and Jay Peak. (Doc. 1 at 8, ¶¶ 51–54.)

Despite Vieira's concerns, in roughly mid-March 2012, Jay Peak provided Vieira with an escrow agreement and offering documents to invest in the Jay Peak Project. (Doc. 1 at 6, ¶ 36.) Apparently, these offering documents included a "due diligence period," which was set to end on approximately June 2, 2012. (*Id.* ¶ 37.) Vieira alleges that Korda "completely failed" to assist with this due diligence process. (*Id.* ¶ 38.)

On or about April 10, 2012, Korda finished preparing a draft I-526 Petition, which described Vieira's intention to invest in the Jay Peak Project and to emigrate from Brazil once his conditional visa was approved under the EB-5 immigrant investor program. (Doc. 17-12 at 2, 4.) This draft petition was not filed at that time.

Instead, Vieira continued to seek additional financial information from Stenger regarding the investment of EB-5 funds. (Doc. 1 at 7, ¶ 41.) Rather than provide

---

[5] Also on March 9, 2012, Korda sent a general email to all of his clients warning that the legislation authorizing the EB-5 regional center program was set to expire on September 30, 2012. (Doc. 17-17 at 2.) Korda's email indicated that there was "overwhelming support in Congress" for extending the regional center program through new legislation, but warned potential investors that there could be repercussions if the legislation did not pass by September 30, 2012. (*Id.* at 3; *see also* Doc. 1 at 6, ¶ 35.)

financial information, on May 21, 2012, a Jay Peak representative provided Vieira with a subscription agreement, an investor questionnaire, and instructions for wiring money to invest in the Jay Peak Project. (Doc. 1 at 6–7, ¶¶ 40–43.) Frustrated by a perceived lack of disclosure, Vieira instructed Korda to draft a letter aborting his investment in the Jay Peak Project. (*Id.* at 7, ¶ 44.) Rather than draft the requested letter, Korda purportedly defended Jay Peak and asked Vieira to meet with Stenger directly. (*Id.* ¶¶ 45–47.) Then, on approximately May 25, Stenger sent Vieira a number of operational reports involving the Jay Peak Project, although these reports did not contain the financial information sought by Vieira. (*Id.* at 7–8, ¶ 48.) It is unclear whether Vieira ever received the additional information he requested. In his Complaint, however, Vieira alleges that he believed "his opportunity to live the American [D]ream was about to disappear if he did not execute the [Jay Peak Project] subscription agreement." (*Id.* at 8, ¶ 49.) As a result, he signed the Jay Peak Project subscription agreement on or about May 30, 2012. (*Id.* ¶ 50.)

Subsequently, additional concerns arose. Specifically, on June 28, 2012, Korda forwarded an email from an attorney representing Jay Peak to Vieira, (Doc. 17-13); the email described recent requests from USCIS seeking additional independent evidence of the budget for the Jay Peak Project and the project's effect on job creation. (Doc. 17-13 at 2.) Given the requests by USCIS, Korda advised Vieira to delay filing the I-526 Petition until Jay Peak provided the evidence requested by USCIS. (*Id.* at 3.) Then, on July 12, 2012, Korda followed up with Stenger for an update because "[he] had] a number of clients anxious to file." (Doc. 17-21 at 2.)

It is unclear whether Jay Peak ever provided the information requested by USCIS.  It is clear, however, that around this time, Korda submitted Vieira's I-526 Petition to the USCIS office in California.  (Doc. 6-1 at 2, ¶ 17; *see also* Doc. 6-3.)  Specifically, an I-797 Notice of Action approving Vieira's I-526 Petition indicates that the California office received Vieira's I-526 Petition on August 23, 2012.  (Doc. 6-3.)  Along with approving Vieira's I-526 Petition as of December 11, 2012, the I-797 Notice also transferred Vieira's approved immigrant visa petition to the Department of State National Visa Center in Portsmouth, New Hampshire, for further processing.  (*Id.*).

After Vieira's I-526 Petition was approved, Korda's representation of Vieira ended and Vieira did not retain Korda for any additional work.  (Doc. 6-1 at 3, ¶¶ 20–21.)  Vieira and his family were granted conditional lawful permanent resident status on September 24, 2013, (Doc. 17-14 at 3), and they then emigrated from Brazil to Stowe, Vermont.  (Doc. 6-1 at 3, ¶ 19; Doc. 1 at 1, ¶ 1.)

In April 2016, the United States Securities and Exchange Commission filed a securities fraud lawsuit against the Jay Peak developers, including Stenger, for misappropriating EB-5 investor funds.  (Doc. 1 at 9, ¶ 57.)

Subsequently, on November 3, 2017, USCIS sent Vieira a Notice of Intent to Deny his application for permanent residency status.  (*See* Doc. 17-14 at 2.)  In evaluating Vieira's I-829 Petition to Remove Conditions, which was filed on September 16, 2015, the USCIS evaluator concluded that the evidence Vieira submitted did not demonstrate that the Jay Peak Project would create enough jobs to satisfy the job creation requirement of the EB-5 program.  (*Id.* at 5.)  As a result, USCIS afforded Vieira an additional 30 days to submit evidence demonstrating his eligibility to have

the conditions on his permanent residency status removed. (*Id.*) The record does not indicate whether Vieira complied with this request; however, Vieira asserts that he is now facing deportation. (Doc. 17 at 15.)

**Procedural Background**

On August 25, 2017, Vieira filed the present lawsuit in this Court. (Doc. 1.) In his Complaint, in addition to the facts set forth above, he brings seven causes of action against Korda and the Firm: in Count I, Vieira claims that Korda and the Firm committed legal malpractice by "failing to abide by Mr. Vieira's lawful instructions and requests," (Doc. 1 at 10, ¶ 66); in Count II, Vieira alleges that Korda and the Firm breached the Agreement by inadequately providing the bargained-for services, (*id.* at 11, ¶¶ 69–74); in Count III, Vieira claims that Korda and the Firm breached the duty of good faith and fair dealing by neglecting to satisfactorily represent Vieira under the Agreement's terms, (*id.* at 11–12, ¶¶ 75–80); in Count IV, Vieira asserts that Korda and the Firm were unjustly enriched by receiving money for legal services that were not performed, (*id.* at 12–13, ¶¶ 81–84); in Count V, Vieira claims that Korda and the Firm violated federal securities law, (*id.* at 13–15, ¶¶ 85–97); in Count VI, Vieira argues that Korda and the Korda Law Firm violated Vermont's Consumer Fraud Act, 9 V.S.A. §§ 2451–2466b, by making false representations that were likely to mislead Vieira, (*id.* at 15–16, ¶¶ 98–104); and in Count VII, Vieira asserts that Korda and the Korda Law Firm breached their fiduciary duty to Vieira by failing to disclose conflicts of interest and by engaging in a "sham representation." (*Id.* at 16–18, ¶¶ 105–116.) For these alleged violations, Vieira seeks total damages in excess of $2,000,000 and such other relief as this Court deems proper. (*Id.* at 18, ¶ 9.)

On October 10, 2017, Korda and the Firm jointly filed the present Motion to Dismiss Case for Lack of Jurisdiction. (Doc. 6.) In the Motion, filed pursuant to Fed. R. Civ. P. 12(b)(2), Korda and the Firm argue that this Court lacks personal jurisdiction because Korda "practices federal immigration law, handled outside of Vermont, without reference to Vermont law." (*Id.* at 3.) Further, according to Korda and the Firm, Korda's representation of Vieira was tangentially related to Vermont only because Vieira chose to invest in the Jay Peak Project. (*Id.*) Aside from this oblique relationship, Korda and the Firm assert that they could not foresee being haled into a Vermont court because the parties' Agreement expressly limited Korda's legal representation to the I-526 Petition, the contract was governed by Florida law, and Vermont has no special interest in resolving Vieira's allegations. (*Id.* at 3–4.)

Vieira opposes the Motion to Dismiss, arguing that "every aspect of Attorney Anthony Korda's and the Korda Law Firm's . . . representation in this matter involved Vermont[ and] no meaningful aspect involved any other location." (Doc. 17 at 1.) Vieira further claims that Korda benefited from an ongoing business relationship with Jay Peak, including Korda's initial investment in the Jay Peak Project as an EB-5 immigrant investor and "as a regular recipient of client 'referrals' from the Jay Peak Eb-5 projects." (*Id.* at 2.) As a result, Vieira asserts that, "[b]oth generally, and as to [himself], Attorney Korda purposefully availed himself of the benefits and privilege of conducting activities with the District of Vermont." (*Id.* (internal quotation marks omitted).)

In reply, Korda and the Firm argue that Vieira's claims have little to do with either the actual contacts between Korda and Vermont or the Agreement that the

parties signed. (Doc. 23 at 1.) Instead, Korda and the Firm again assert that their

contract with Vieira concerned only Vieira's I-526 Petition and they deny any

responsibility for Vieira's decision to invest in the Jay Peak Project. (*Id.* at 2.)

On April 11, 2018, this Court held a hearing on the pending Motion to Dismiss,

wherein both parties repeated the arguments advanced in their memoranda. *See*

*generally* Hearing Argument, *Viera v. Korda et al.*, No. 2:17–cv–160 (April 11, 2018)

(Conroy, Mag. J.). Neither party presented additional evidence. (*Id.*) At the end of

the hearing, for the first time, Vieira's counsel requested jurisdictional discovery. (*Id.*

at 2:02.)

## Analysis

### I. Personal Jurisdiction

#### A. Legal Standard

"In the absence of a federal statute specifically directing otherwise, and subject

to limitations imposed by the United States Constitution, [courts] look to the law of

the forum state to determine whether a federal district court has personal jurisdiction

over a foreign corporation." *Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 624 (2d

Cir. 2016). On a motion to dismiss for lack of personal jurisdiction, the plaintiff bears

the burden of demonstrating that the defendant has sufficient contacts with the forum

state to provide the court with jurisdiction over the defendant's person. *Country Home*

*Prod., Inc. v. Schiller-Pfeiffer, Inc.*, 350 F. Supp. 2d 561, 566–67 (D. Vt. 2004) (citing

*Metro. Life Ins. Co. v. Robertson–Ceco Corp.*, 84 F.3d 560, 566 (2d Cir. 1996)). Where,

as here, no evidentiary hearing has been held on the Motion to Dismiss and no

discovery has occurred, the "plaintiff may defeat a motion to dismiss based on legally

sufficient allegations of jurisdiction." *Metro. Life Ins. Co.*, 84 F.3d at 566; *see also*

*Whitaker*, 261 F.3d at 208 ("A plaintiff may carry this burden by pleading in good faith

. . . legally sufficient allegations of jurisdiction, i.e., by making a prima facie showing

of jurisdiction." (alteration in original) (internal quotation marks omitted)).[6]  In

evaluating this prima facie showing, "all allegations are construed in the light most

favorable to the plaintiff and doubts are resolved in the plaintiff's favor." *Whitaker*,

261 F.3d at 208 (alterations and internal quotation marks omitted).

Personal jurisdiction generally involves a two-step inquiry.  A court must first

determine whether the defendant is amendable to service of process under the forum

state's laws, *Bensusan Restaurant Corp. v. King*, 126 F.3d 25, 27 (2d Cir. 1997), and,

next, the court must decide whether the Due Process Clause of the Fourteenth

Amendment permits the exercise of personal jurisdiction over the defendant.  *Int'l*

*Shoe Co. v. State of Wash.*, 326 U.S. 310, 316 (1945).  In Vermont, however, the

Vermont Supreme Court has interpreted the state's long-arm statute, 12 V.S.A.

§ 913(b),[7] to allow the assertion of jurisdiction to the "full extent permitted by the Due

Process Clause" of the Federal Constitution.  *Northern Aircraft, Inc. v. Reed*, 154 Vt.

36, 40, 572 A.2d 1382, 1385 (1990).  In other words, the two inquiries merge under

Vermont law and the Court may exercise personal jurisdiction so long as jurisdiction

---

[6]  "Eventually, of course, the plaintiff must establish jurisdiction by a preponderance of the evidence, either at a pretrial evidentiary hearing or at trial.  But until such a hearing is held, a prima facie showing suffices, notwithstanding any controverting presentation by the moving party, to defeat the motion."  *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir. 1981).

[7]  12 V.S.A. § 913(b) provides: "Upon the service [of process on a party outside the state], and if it appears that the contact with the State by the party or the activity in the State by the party or the contact or activity imputable to him or her is sufficient to support a personal judgment against him or her, the same proceedings may be had for a personal judgment against him or her as if the process or pleading had been served on him or her in the State."

comports with constitutional due process. *Ben & Jerry's Homemade, Inc. v. Coronet Priscilla Ice Cream Corp.*, 921 F. Supp. 1206, 1209 (D. Vt. 1996).

To comply with the limitations imposed by the Due Process Clause, personal jurisdiction must satisfy both a "minimum contacts" test and a "reasonableness" inquiry. *Metro. Life Ins. Co.*, 84 F.3d at 567. With respect to minimum contacts, the plaintiff must demonstrate that the defendant has sufficient contacts with the forum state to justify the court's exercise of personal jurisdiction over the defendant. *Int'l Shoe Co.*, 326 U.S. at 316. "Intentional and affirmative action by the nonresident defendant in the forum state is the key to personal jurisdiction." *Ben & Jerry's*, 921 F. Supp. at 1210; *see also Asahi Metal Indus. Co., Ltd. v. Super. Ct. of Cal., Solano Cty.*, 480 U.S. 102, 109 (1987) ("[M]inimum contacts must have a basis in 'some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'" (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)).

In determining whether minimum contacts exist, courts distinguish between "specific" and "general" jurisdiction. Specific jurisdiction—also known as "case-linked" jurisdiction, *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)—applies "when a State exercises personal jurisdiction over a defendant in a suit arising out of or related to the defendant's contacts with the forum." *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n.8 (1984). By comparison, general jurisdiction—or "all purpose" jurisdiction, *Goodyear Dunlop Tires Operations*, 564 U.S. at 919—usually applies to corporations and "is based on the defendant's general business contacts with the forum state and permits a court to exercise its

power in a case where the subject matter of the suit is unrelated to those contacts."

*Metropolitan Life*, 84 F.3d at 567–68. Because the contacts that establish general

jurisdiction are unrelated to the events giving rise to the suit, courts impose a "more

stringent" version of the minimum contacts test for general jurisdiction than for

specific jurisdiction. *Id.* at 568. That more stringent test is whether the defendant-

corporation's "affiliations with the State are so 'continuous and systematic' as to

render [it] essentially at home in the forum State." *Daimler AG v. Bauman*, 134 S. Ct.

746, 761 (2014) (alteration in original) (quoting *Goodyear Dunlop Tires Operations*,

564 U.S. at 919).

If the plaintiff establishes the defendant's minimum contacts with the forum

state, the "reasonableness" inquiry requires the court to decide "whether the assertion

of personal jurisdiction would comport with 'fair play and substantial justice.'" *Burger*

*King*, 471 U.S. at 476 (quoting *Int'l Shoe*, 326 U.S. at 320). In making this

determination, the court looks to "the burden on the defendant, the forum State's

interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and

effective relief, the interstate judicial system's interest in obtaining the most efficient

resolution of controversies, and the shared interest of the several States in furthering

fundamental substantive social policies." *Id.* at 477 (internal quotations omitted).

"While the exercise of jurisdiction is favored where the plaintiff has made a threshold

showing of minimum contacts at the first stage of the inquiry, it may be defeated

where the defendant presents 'a compelling case that the presence of some other

considerations would render jurisdiction unreasonable.'" *Metropolitan Life*, 84 F.3d at

568 (quoting *Burger King*, 471 U.S. at 477).

### B.    Specific Jurisdiction over Korda Individually

Here, as discussed in detail below, the Court concludes that the Complaint does not plausibly allege that Korda has the requisite "minimum contacts" with Vermont with respect to Vieira's claims arising from contract and tort law; however, as to Vieira's private action under the Securities Exchange Act of 1934, the Court concludes that Korda has sufficient contacts with the United States generally for this Court to exercise personal jurisdiction.  Nevertheless, under the second step of the due process inquiry, the Court determines that other considerations render personal jurisdiction over Korda unreasonable.

### 1.    Minimum Contacts Inquiry

The Court first examines Korda's minimum contacts in relation to the counts set forth in Vieira's Complaint.  As summarized above, under the Due Process Clause, whether an out-of-state defendant's contacts with the forum state give rise to specific jurisdiction "depends on an affiliation between the forum and the underlying controversy." *Goodyear Dunlop Tires Operations,* 564 U.S. at 919 (alteration and internal quotation marks omitted); *Huey v. Bates*, 135 Vt. 160, 164, 375 A.2d 987, 990 (1977) (stating that there must be a "nexus between the defendant, the injuring agency, and the cause of action brought in the forum state").  Courts evaluate this nexus under a totality of the circumstances test, always considering the "quality and nature" of the contacts between the out-of-state defendant, the forum state, and the cause of action.  *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 242 (2d Cir. 2007) (quoting *Burger King*, 471 U.S. at 475); *see also Walden v. Fiore*, 134 S. Ct. 1115, 1121 (2014) ("For a State to exercise jurisdiction consistent with due process, the

defendant's suit-related conduct must create a substantial connection with the forum State." In this case, Vieira's Complaint contains counts arising from (a) contract law, (b) tort law, and (c) federal securities law. (*See* Doc. 1 at 10–18, ¶¶ 61–116.) Below, the Court examines the quality and nature of Korda's contacts with Vermont in relation to these causes of action.

### a. Claims Sounding in Contract

Three counts in Vieira's Complaint are grounded in contract law: in Count II, Vieira alleges that Korda breached their Agreement by failing to provide the bargained-for services, (Doc. 1 at 11, ¶¶ 69–74); in Count III, Vieira claims that Korda breached the duty of good faith and fair dealing by failing to adequately represent Vieira under the contract's terms, (*id.* at 11–12, ¶¶ 75–80); and in Count IV, Vieira asserts that Korda was unjustly enriched by receiving money for unperformed legal services. (*Id.* at 12–13, ¶¶ 81–84.) As to these claims, the Court concludes that Vieira's Complaint does not plausibly allege that Korda had sufficient "minimum contacts" with Vermont for the Court to exercise personal jurisdiction over Korda.

Where specific jurisdiction is purportedly grounded in a contractual relationship, a nonresident defendant generally satisfies the minimum-contacts test by reaching out beyond his or her state to "create continuing relationships and obligations" with the citizens of the forum state. *Burger King*, 471 U.S. at 473 (internal quotation marks omitted). The mere fact that an out-of-state party contracts with a forum state's resident does not, by itself, automatically establish sufficient minimum contacts in the forum state. *Id.* at 478. Instead, the court must examine the "prior negotiations and contemplated future consequences, along with the terms of the

18

contract and the parties' actual course of dealing" to evaluate whether the defendant purposefully established minimum contacts within the forum. *Id.* at 479. The touchstone of the inquiry is whether it is foreseeable that "the defendant's conduct and connection with the forum State are such that he [or she] should reasonably anticipate being haled into court there." *Id.* at 474 (internal quotation marks omitted); *see also Best Van Lines, Inc.*, 490 F.3d at 242 ("The crucial question is whether the defendant has purposefully availed itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." (alteration and internal quotation marks omitted)).

Here, Vieira's Complaint does not plausibly allege that the parties' Agreement created sufficient contacts with Vermont for Korda to reasonably anticipate being haled into a Vermont court. As an initial matter, when Vieira and Korda entered into the contract, neither party resided in Vermont; instead, Vieira resided in Brazil and Korda resided in Florida. (Doc. 6-1 at 1, ¶ 8; Doc. 17-12 at 4.) Further, nothing in the parties' Agreement gave rise to a specific legal obligation in Vermont, nor did the contract create a legal benefit in Vermont. (*See generally id.*) Instead, the contract limited the duration, scope, and location of Korda's obligations to preparing and filing Vieira's I-526 Petition, with the goal of securing Vieira's conditional immigration into the United States under the EB-5 program. *See Bissonnette v. Podlaski*, 138 F. Supp. 3d 616, 625 (S.D.N.Y. 2015) (declining to exercise personal jurisdiction in New York where "Defendants' engagement letter expressly limited their representation of Plaintiff."). Beyond these services, the contract specified that "[n]o other legal services [were to be] provided under [the] Fee Agreement for Legal Services." (Doc. 6-2 at 3.)

19

As the correspondence between Korda and Vieira indicates, moreover, Korda anticipated performing all of his contractual obligations from Florida. (Doc. 17-9.) Finally, the contract stated that Florida law would govern any dispute, indicating that the parties' perceived their contacts to be with Florida, not Vermont. *RLB & Assocs., Ltd. v. Aspen Med. Pty.*, Case No. 2:15-cv-123, 2016 WL 344925, at *6 (D. Vt. Jan. 27, 2016) (citing *Thompson Hine, LLP v. Taieb*, 734 F.3d 1187, 1192 (D.C. Cir. 2013)). In sum, given the parties' correspondence and the express language in the Agreement, it is plain that neither party contemplated that the Agreement would produce ongoing and wide-reaching contacts with Vermont. *Cf. Burger King Corp.*, 471 U.S. at 473, 480.

Furthermore, although Vieira's investment in the Jay Peak Project formed the basis for the I-526 Petition prepared by Korda, Vieira's decision to invest does not, by itself, establish Korda's minimum contacts with Vermont. (Doc. 6-2 at 3.) On this point, *Bissonnette v. Podlaski* is instructive. *See generally* 138 F. Supp. 3d 616. In *Bissonnette*, the plaintiff, a former U.S. Navy SEAL, agreed to publish a book with a New York publisher. *Id.* at 619. Subsequently, the plaintiff's New York literary agent contacted the defendants, an Indiana law firm, who agreed to examine the book for potentially classified information and to provide advice regarding the plaintiff's confidentiality obligations. *Id.* Although the defendants communicated with the plaintiff, his publisher, and his agent in New York for this purpose, at no time did the defendants actually enter New York or represent the plaintiff in New York. *Id.* at 624. Based on these facts, the Southern District of New York concluded that the defendant's activities did not confer personal jurisdiction in New York. *Id.* The court

acknowledged that "aspects of the underlying transaction . . . took place in New York" but noted that the "[d]efendants' engagement letter expressly limited their representation of [the] [p]laintiff," that the defendants did not agree to provide representation in New York relating to the contract, and that the defendants never actually provided representation in New York. *Id.* at 625.

As in *Bissonnette*, the contract between Korda and Vieira contained express limitations. As noted above, the contract specifically restricted Korda's representation to the preparation and filing of the I-526 Petition. (Doc. 6-2 at 3.) Similarly, the Agreement required Vieira to certify that "he or she has reached a firm and final decision to invest in [the Jay Peak Project] *independently*." (*Id.* at 1 (emphasis added).) By agreeing to this language, the parties plainly limited the services provided under the contract and, further, indicated that Korda did not anticipate any future consequences arising from the Jay Peak Project's location in Vermont. *See Bissonnette*, 138 F. Supp. 3d at 625. Like *Bissonnette*, moreover, Korda did not agree to provide representation for Vieira in Vermont, nor did Korda actually provide representation in Vermont. *Id.* Korda did what Vieira hired him to do: he prepared and filed Vieira's I-526 Petition, which resulted in USCIS granting Vieira and his family conditional lawful permanent resident status. (Doc. 17-14 at 3.) These actions do not suggest that Korda anticipated being haled into Vermont court on the basis of the Agreement. *Cf. Burger King Corp.*, 471 U.S. at 473, 480.

Accordingly, as to Vieira's contractual claims, the Complaint does not allege sufficient contacts with Vermont for the Court to exercise personal jurisdiction over Korda.

### b. Claims Arising From Tort Law

Similarly, Vieira's Complaint does not plausibly allege that Korda's purportedly tortious conduct created a substantial connection with Vermont sufficient for this Court to exercise personal jurisdiction over Korda.

For a claim sounding in tort, such as legal malpractice or breach of fiduciary duty, *see* Restatement (Second) of Torts §§ 299A, 874 (1979), if a nonresident defendant committed the tort within the forum state, a sufficient nexus generally exists between the out-of-state defendant, the forum state, and the cause of action. *Goodyear Dunlop Tires Operations*, 564 U.S. at 919; *cf. Schwartz v. Frankenhoff*, 169 Vt. 287, 293, 733 A.2d 74, 79 (1999) (stating attorneys' letters and phone calls to Vermont residents were insufficient for jurisdiction absent an "independent wrong" committed by the attorney). In other instances, a sufficient relationship with the forum state may arise if a nonresident defendant "intentionally acts outside the forum state to cause tortious harm within the forum state." *Schwartz*, 169 Vt. at 293, 733 A.2d at 79 (citing *Calder v. Jones*, 465 U.S. 783, 788–89 (1984)). In either circumstance, "the relationship must arise out of contacts that the 'defendant *himself*' creates with the forum State" and "not [from] the defendant's contacts with persons who reside there." *Walden*, 134 S. Ct. at 1122 (quoting *Burger King Corp.*, 471 U.S. at 475) (emphasis in original). In other words, "the defendant's suit-related conduct must create a substantial connection with the forum State," a nonresident defendant cannot be haled into court "based on the 'random, fortuitous, or attenuated' contacts he makes by interacting with other persons affiliated with the State." *Id.* at 1121–23 (quoting

22

*Burger King*, 471 U.S. at 475); *see also State v. Atl. Richfield Co.*, 2016 VT 22, ¶ 14, 201 Vt. 342, 142 A.3d 215.

Applying these principles, Vieira's Complaint does not plausibly allege that Korda's conduct created a substantial connection with Vermont. The three counts in Vieira's Complaint sounding in tort law are based on the attorney-client relationship formed between Korda and Vieira and their resulting communications: in Count I, Vieira claims that Korda committed legal malpractice by "failing to abide by Mr. Vieira's lawful instructions and requests," (Doc. 1 at 10, ¶ 66); in Count VI, Vieira argues that Korda violated Vermont's Consumer Fraud Act, 9 V.S.A. §§ 2451–2466b[8] by making false representations that were likely to mislead Vieira, (*id.* at 15–16, ¶¶ 99–101); and in Count VII, Vieira asserts that Korda breached his fiduciary duty to Vieira by failing to disclose his conflicts of interest and by engaging in a "sham representation." (*Id.* at 17–18, ¶¶ 109, 111.) Simply put, these allegations rely on Korda's contacts with Vieira, not Korda's contacts with Vermont. *Cf. Walden*, 134 S. Ct. at 1122 ("[O]ur 'minimum contacts' analysis looks to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there.").

Further, Korda had no physical presence in Vermont. As noted above, Korda is a Florida resident and does not maintain a law office in Vermont, (Doc. 1 at 1, ¶¶ 2, 3),

---

[8] Vermont's Consumer Fraud Act provides a private cause of action to consumers who contract for goods or services in reliance upon false or fraudulent representations or practices prohibited by Vt. Stat. Ann. tit. 9 § 2453, or who sustain damages or injury as a result of the same. *Id.* § 2461(b). Given that tort law concepts of fraudulent misrepresentation inform consumer fraud claims, *see* Restatement (Second) of Torts § 557 (1977), the Court considers Vieira's consumer fraud claim along with his other claims sounding in tort law. The Court notes, however that, "although certain representations may give rise to a [legal] malpractice claim, they are generally not actionable under the Consumer Fraud Act if they are the product of the defendant's 'professional judgment based upon his legal knowledge and skill.'" *Webb v. Leclair*, 2007 VT 65, ¶ 23, 182 Vt. 559, 933 A.2d 177 (quoting *Kessler v. Loftus*, 994 F. Supp. 240, 243 (D. Vt. 1997)).

nor does it appear from the Complaint that Korda ever visited Vermont, let alone that Korda went to Vermont in order to represent Vieira. "[A]lthough physical presence in the forum is not a prerequisite to jurisdiction, . . . physical entry into the State—either by the defendant in person or through an agent, goods, mail, or some other means—is certainly a relevant contact." *Walden*, 134 S. Ct. at 1122. The lack of Korda's physical presence is particularly relevant here because, without a physical presence in Vermont, Korda's link to Vieira is one of the only connections between Korda and Vermont.[9] *Id.* ("[T]he plaintiff cannot be the only link between the defendant and the forum.").

Similarly, the Complaint does not plausibly allege that Korda directed the purportedly harmful effects of his out-of-state conduct at Vermont. *See Calder*, 465 U.S. at 787 n.6. Korda did not market his legal services to potential clients in Vermont nor did Korda purposefully seek to promote and maintain a client base in Vermont. (Doc. 6-1 at 2, ¶ 4.) Instead, he marketed himself to clients as having the ability to assist them in the EB-5 application process. (*Id.*); *cf. Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 128 (2d Cir. 2002) ("[T]he picture which emerges from the above facts is that of a law firm which seeks to be known in the New York legal market, makes efforts to promote and maintain a client base there, and profits substantially therefrom."). While it is true that Stenger referred prospective investors in the Jay Peak Project to Korda, "a defendant's relationship

---

[9] As noted above, Korda gained his permanent residency by investing in an early stage of the Jay Peak and participating in the EB-5 Immigrant Investor Program. (Doc. 1 at 3, ¶ 19.) But this prior interaction with Vermont and the Jay Peak Project is not suit-related conduct and, so, cannot be the basis for jurisdiction. *Walden*, 134 S. Ct. at 1121.

with a plaintiff or *third party*, standing alone, is an insufficient basis for jurisdiction." *Walden*, 134 S. Ct. at 1123 (emphasis added). Here, only Stenger's referral[10] and Vieira's independent decision to invest in the Jay Peak Project connect Korda with Vermont. Indeed, the Complaint fails to allege that, in the course of the parties' attorney-client relationship, Korda communicated with Vieira while he was living in Vermont. Absent additional and plausible allegations that Korda intentionally directed his conduct at Vermont residents, Korda cannot be haled into a Vermont court based on his attenuated interactions with Stenger and Jay Peak. *Id.*; *see also Smith v. Morris & Manning*, 647 F. Supp. 101, 103 (S.D.N.Y. 1986) (declining personal jurisdiction where the attorney "performed all of its services for [the plaintiff] in Georgia, leaving those services to be performed within New York to [the plaintiff's] local counsel" and "[t]he agreement under which [the plaintiff] retained [the attorney] was entered into while he resided in South Carolina, and no one from the firm has ever been present within [New York] in connection with the firm's services for [the plaintiff].").

---

[10] At the hearing, Vieira's counsel expanded on this allegation, claiming that Stenger referred "well over 20 and less than 100" potential Jay Peak investors to Korda and arguing that, because Korda profited from these referrals, personal jurisdiction was appropriate in Vermont. Hearing Argument at 1:52–1:57, *Viera v. Korda et al.*, No. 2:17–cv–160 (April 11, 2018) (Conroy, Mag. J.); (*see also* Doc. 17 at 20). Even crediting these additional allegations as true, *Metropolitan Life Insurance Co.*, 84 F.3d at 566, these claims are insufficient to establish this Court's personal jurisdiction because "a defendant's relationship with a . . . third party, standing alone, is an insufficient basis for jurisdiction." *Walden*, 134 S. Ct. at 1123. Moreover, Vieira's allegations regarding the purported referral program principally involve Stenger's actions, rather than Korda's suit-related conduct. *Id.* at 1122 ("[I]t is the defendant's conduct that must form the necessary connection with the forum State."). As discussed above, all of Korda's suit-related conduct occurred in Florida and involved the preparation and filing of Vieira's I-526 Petition under federal immigration law. No allegation suggests that Korda directed his conduct at Vermont residents or, indeed, suggests that Korda communicated with anyone in Vermont other than Stenger. Finally, to the extent that Vieira argues that he was damaged in Vermont by Korda's purported malfeasance, "[i]t is not sufficient that conduct incidentally had an effect in the forum, or even that effects in the forum were foreseeable." *Gordon v. Invisible Children, Inc.*, No. 14 Civ. 4122(PGG), 2015 WL 5671919, at *7 (S.D.N.Y. Sept. 24, 2015).

Vieira's arguments to the contrary are not persuasive. Vieira urges this Court to exercise personal jurisdiction because "[e]very aspect of the transaction and every aspect of this litigation is . . . in Vermont." (Doc. 17 at 23.) As an initial matter, to the extent that Vieira's personal-jurisdiction argument relies on acts performed by Vieira—such as Vieira's establishment of a bank account in Vermont and his current residence in Vermont, (Doc. 17 at 23–24)—these acts cannot form the basis for the Court's personal jurisdiction over Korda. *Walden*, 134 S. Ct. at 1122 ("We have consistently rejected attempts to satisfy the defendant-focused "minimum contacts" inquiry by demonstrating contacts between the plaintiff (or third parties) and the forum State."). More importantly, Vieira's argument relies on the faulty assumption that Vieira's independent decision to invest in the Jay Peak Project provides a basis for personal jurisdiction over Korda. Instead, as discussed above, Vieira's investment in the Jay Peak Project was collateral to the core purpose of the parties' Agreement and the resulting attorney-client relationship. *Cf. Smith,* 647 F. Supp. at 103; *Bissonnette*, 138 F. Supp. 3d at 625. Moreover, Vieira's decision to invest in the Jay Peak Project does not establish a sufficient affiliation between Korda and Vermont. *Walden*, 134 S. Ct. at 1122. Although personal jurisdiction may arise if "a defendant's contacts with the forum State [are] intertwined with his transactions or interactions with the plaintiff or other parties," *id*. at 1123, Vieira's Complaint does not point to any conduct by Korda that formed a sufficient connection with Vermont, aside from the parties' attorney-client relationship. *Id.* at 1122 ("[T]he plaintiff cannot be the only link between the defendant and the forum. Rather, it is the defendant's conduct

that must form the necessary connection with the forum State that is the basis for its jurisdiction over him.").

Indeed, rather than citing precedent to support his assertion of Korda's "minimum contacts" with Vermont, Vieira relies on case law that emphasizes the absence of any affiliation between Korda and Vermont. In each case cited by Vieira, (*see* Doc. 17 at 22–23), the nonresident attorney or attorneys provided services in the forum state, specifically availing themselves of the forum state's laws and protections. *See, e.g.*, *Schur v. Porter*, 712 F. Supp. 1140, 1145 (S.D.N.Y. 1989) (exercising personal jurisdiction where out-of-state attorneys contracted to represent clients in the forum state and to negotiate and form partnerships in the forum state); *Gracious Living Corp. v. Colucci & Gallaher, PC*, 216 F. Supp. 3d 662, 669 (D.S.C. 2016) (finding jurisdiction where out-of-state attorney prepared and filed a confession of judgment in the forum state); *Pagliara v. Johnston Barton Proctor & Rose, LLP*, No. 3:10-cv-00679, 2010 WL 3940993, at *4 (M.D. Tenn. Oct. 6, 2010) (exercising jurisdiction where the out-of-state attorney directed purportedly tortious conduct at resident of the forum state); *Gomberg v. Shosid*, No. 1:05-cv-356, 2006 WL 1881229, at *5 (E.D. Tenn. July 6, 2006) (finding personal jurisdiction where the purpose of the contract was to provide for the sale of assets in the forum state); *Masada Inv. Corp. v. Allen*, 697 S.W.2d 332, 335 (Tenn. 1985) (finding jurisdiction over attorney who prepared documents to be filed in forum state). Here, nothing in the Complaint plausibly alleges that Korda provided services in Vermont and, indeed, the Agreement expressly limited Korda's services to preparing and filing the I-526 Petition.

In sum, the conduct at issue here—the performance of legal research, rendering of legal advice, and preparation of the I-526 Petition—occurred in Florida. Nothing in the Complaint plausibly suggests that Korda's suit-related conduct sufficiently affiliated him with Vermont. As a result, the Complaint does not plausibly allege the necessary minimum contacts for personal jurisdiction over Korda as to Vieira's claims sounding in tort.

### c.      Federal Securities Law Claim

A private cause of action may be brought under 17 C.F.R § 240.10b-5, which the U.S. Securities and Exchange Commission promulgated pursuant to § 10(b) of the Securities Exchange Act. *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011). In bringing a Rule 10b-5 action, the Securities Exchange Act authorizes worldwide service of process, *see* 15 U.S.C. §§ 77v(a), 78aa, and "permits the exercise of personal jurisdiction to the limit of the Due Process Clause of the Fifth Amendment." *S.E.C. v. Unifund SAL*, 910 F.2d 1028, 1033 (2d Cir. 1990). Thus, unlike the personal jurisdiction analysis described above, which is derived from the limitations placed on the states by the Due Process Clause of the Fourteenth Amendment, *International Shoe* and its progeny do not directly govern personal jurisdiction in matters involving federal securities laws. *S.E.C. v. Softpoint, Inc.*, No. 95 Civ. 2951 GEL, 2001 WL 43611, at *3 (S.D.N.Y. Jan. 18, 2001). Nevertheless, given the identical language in the Fifth Amendment's Due Process Clause, *id.*, courts generally apply the same two-part test for personal jurisdiction: "the 'minimum contacts inquiry' and the 'reasonableness' inquiry." *See, e.g.*, S.*E.C. v. Compania Internacional Financiera S.A.*, No. 11 Civ. 4904(DLC), 2011 WL 3251813, at *4

(S.D.N.Y. July 29, 2011) (quoting *Metro. Life Ins. Co.*, 84 F.3d at 567). Because the Securities Exchange Act provides for worldwide service of process, the relevant "minimum contacts inquiry" is whether the defendant has "sufficient contacts" with the United States as a whole. *Compania Internacional Financiera S.A.*, 2011 WL 3251813, at *4; *see also Softpoint, Inc.*, 2001 WL 43611, at *3 ("[W]here, as here, the United States, and not the [forum state], is the only sovereign whose power to adjudicate is in question, . . . the relevant 'minimum contacts' . . . should be the defendant's contacts with the United States, and not his contacts with the [forum state.]").

Here, because the Complaint alleges sufficient contacts by Korda with the United States, the "minimum contacts" element of the personal-jurisdiction inquiry has been satisfied as to Vieira's federal securities law claim. *See S.E.C. v. Syndicated Food Servs. Int'l, Inc.*, No. 04-CV-1303 (NGG)(ALC), 2010 WL 3528406, at *2 (E.D.N.Y. Sept. 3, 2010) ("The minimum contacts requirement is satisfied where a defendant's conduct and connection with the United States are such that 'he should reasonably anticipate being haled into court there.'" (quoting *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980))). Korda is a citizen and resident of the United States and all of his alleged unlawful conduct took place in the United States. (Doc. 1 at 1, ¶ 2; *see generally id.* at 2–10, ¶¶ 7–60.) Indeed, Korda does not assert that he has insufficient contacts with the United States, but instead focuses on the absence of connections with Vermont in his Motion to Dismiss. (*See generally* Doc. 6.)

Accordingly, because Vieira's Complaint alleges sufficient minimum contacts as to federal securities law, the Court turns to the second part of the due process inquiry.

## 2. Reasonableness Inquiry

Under the second prong of the due process test, the Court must consider whether exercising personal jurisdiction over Korda as to Vieira's federal securities law claim would be reasonable.[11]  Determining that exercising personal jurisdiction in this manner would effectively bifurcate Vieira's federal securities claim from his tort and contract law claims, the Court concludes that personal jurisdiction is unreasonable.

As the Second Circuit has observed, "the exercise of jurisdiction is favored where the plaintiff has made a threshold showing of minimum contacts at the first stage of the inquiry." *Metro. Life Ins. Co.*, 84 F.3d at 568.  In evaluating whether the assertion of personal jurisdiction comports with "traditional notions of fair play and substantial justice" a court must assess five factors:

> (1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies.

---

[11]  Because Korda lacks the requisite "minimum contacts" with Vermont in relation to Vieira's tort and contract law claims, the Court need not move on to the second step of the personal jurisdiction inquiry and examine the "fair play and substantial justice" of personal jurisdiction in relation to Vieira's claims sounding in tort and contract.  *See Burger King*, 471 U.S. at 476 (quoting *Int'l Shoe*, 326 U.S. at 320); *see also Metro. Life Ins. Co.*, 84 F.3d at 568 (observing that if minimum contacts are lacking, "the inquiry ends" and there is no need to evaluate the reasonableness prong (quoting *Donatelli v. Nat'l Hockey League*, 893 F.2d 459, 465 (1st Cir. 1990)).

*Id.* (citing *Asahi Metal Indus. Co.*, 480 U.S. at 113–14). Furthermore, in evaluating these factors, a court's exercise of jurisdiction may be defeated where "the defendant presents 'a compelling case that the presence of some other considerations would render jurisdiction unreasonable.'" *Id.* (quoting *Burger King*, 471 U.S. at 477).

Here, because the Court lacks personal jurisdiction over Korda as to the tort and contract law claims, the five factors outlined above weigh decisively against this Court exercising personal jurisdiction over Korda in relation to Vieira's federal securities law claim. Under the first factor, given the convenience of modern communication and transportation, it would appear that Korda would only be slightly burdened by traveling to Vermont to defend the federal securities law claim. *Metro. Life Ins. Co.*, 84 F.3d at 574. Critically, however, Korda would be significantly burdened if he were forced to defend himself in two related matters in separate jurisdictions in Florida and Vermont. As to the second factor, because federal courts have exclusive jurisdiction to adjudicate violations of the Securities Exchange Act, Vermont has no distinct or local interest in resolving this discrete dispute, let alone a greater interest than Florida. *See* 15 U.S.C. § 78aa(a). Further, under the third factor, because Vieira would be forced to pursue his actions in both Vermont and Florida district court, Vieira's ability to obtain convenient and effective relief would be unduly hampered. In other aspects, moreover, a suit in Florida would be more appropriate than an action in Vermont, given that Korda resides in Florida and any records are more likely to be found in his office in Florida. This fact also favors jurisdiction in Florida under the fourth factor, because "courts generally consider where witnesses and evidence are likely to be located." *Metro. Life Ins. Co.*, 84 F.3d

at 574. More importantly, the interstate judicial system's interest in obtaining the most efficient resolution of this controversy plainly weighs against dividing Vieira's claims between Vermont and Florida. Finally, the fifth factor does not favor either party because neither party identifies substantive social policies that would be furthered by permitting the federal securities law claim to be heard in Vermont.

In sum, four of the five factors weigh against the exercise of personal jurisdiction, particularly because it would be unreasonable to bifurcate Vieira's claims on the basis of personal jurisdiction over Korda. Thus, under the circumstances, personal jurisdiction over Korda would not comport with "traditional notions of fair play and substantial justice." *Id.* at 575.

### C. Specific Jurisdiction over the Firm

Similarly, the Court concludes that it lacks specific personal jurisdiction over the Firm.

Like a natural person, a corporation may be subject to specific jurisdiction if the corporation's activities within the state give rise to obligations affiliated with the case before the court. *Int'l Shoe Co.*, 326 U.S. at 319. In judging the minimum contacts of a corporation, "agency relationships[] . . . may be relevant to the existence of specific jurisdiction" because "a corporation can purposefully avail itself of a forum by directing its agents or distributors to take action there." *Daimler*, 134 S. Ct. at 759 n.13 (emphasis omitted). On the other hand, "the casual presence of the corporate agent or even his conduct of single or isolated items of activities in a state in the corporation's behalf are not enough to subject it to suit on causes of action unconnected with the activities there." *Int'l Shoe Co.*, 326 U.S. at 317. The touchstone is whether

the corporation can reasonably anticipate being haled into court in the forum state based on the agent's activities. *Burger King*, 471 U.S. at 474.

Here, Vieira points to no basis, other than Korda's personal actions, for this Court to exercise specific jurisdiction over the Firm. Vieira's Complaint states that Korda "was actively involved in the management, business decisions, and marketing of The Korda Law Firm." (Doc. 1 at 2, ¶ 9.) But Korda's management of the Firm neither links the Firm with activities in Vermont, nor plausibly establishes that Korda acted as an agent of the Firm in Vermont. In fact, like Korda, the Firm has no physical presence in Vermont. (*Id.* at 1, ¶¶ 2–3.) Moreover, as stated above, this Court has concluded that Korda's activities are insufficient to support specific personal jurisdiction over him; given this conclusion, Korda's activities as a purported agent of the Firm are also insufficient to form the basis for specific jurisdiction over the Firm, absent plausible allegations in the Complaint of specific actions taken by the Firm directed at Vermont. And the Complaint contains no such allegations. Thus, the Firm has insufficient contacts for this Court to exercise specific personal jurisdiction and there is no need to inquire into the reasonableness of jurisdiction. *Metro. Life Ins. Co.*, 84 F.3d at 568 (citing *Donatelli v. Nat'l Hockey League*, 893 F.2d 459, 465 (1st Cir. 1990)).

Accordingly, Vieira has failed to plausibly allege that this Court has specific personal jurisdiction over the Firm.

### D. General Jurisdiction over the Firm

The Court next addresses Vieira's proposition "that general jurisdiction should be applicable to any attorney who regularly practices law within a given state" and, as a result, the Firm should be subject to general jurisdiction in Vermont. (Doc. 17 at 24–25.) As Vieira acknowledges, (*id.* at 24), this argument runs counter to the Supreme Court's decision in *Daimler*, 134 S. Ct. 746; as such, this Court declines to endorse this argument.

In *Daimler*, the Supreme Court reiterated that general jurisdiction over a foreign corporation requires "affiliations with the State [that] are so 'continuous and systematic' as to render [it] essentially at home in the forum State." *Id.* at 761 (second alteration in original) (quoting *Goodyear Dunlop Tires Operations*, 564 U.S. at 919). Applying this principle, the Supreme Court refused to exercise general jurisdiction over a foreign corporation that was neither incorporated in the forum state nor had a principal place of business in the forum state, even though the foreign corporation had a subsidiary in the forum state. *Id.*; *see also Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122 (2d Cir. 2014).

Here, the Firm is not incorporated in Vermont, nor does it have a principal place of business in Vermont. (Doc. 1 at 1, ¶¶ 2–3.) This is not the "'exceptional case'" where a court may exercise general jurisdiction even though Vermont is not the Firm's formal place of incorporation or its principal place of business. *Gucci Am., Inc.*, 768 F.3d at 135 (quoting *Daimler*, 134 S. Ct. at 761 n.19). Moreover, Vieira's argument that Korda regularly practices law in Vermont is belied by the record; as discussed above, Korda's practice involves federal immigration law and, specifically, the

34

preparation and filing of EB-5 applications. Nothing in the record plausibly establishes that Korda regularly practices law in Vermont, let alone with the continuous and systematic frequency necessary to establish general jurisdiction. *Cf. Daimler*, 134 S. Ct. at 761.

Accordingly, the Court concludes that Vieira's Complaint does not plausibly allege that this Court has general personal jurisdiction over the Firm.

## III.   Transfer of Venue

Because the Court lacks personal jurisdiction over Korda and the Firm, the lawsuit cannot proceed in Vermont. But "the Court's lack of [personal] jurisdiction does not require dismissal of the action because 28 U.S.C. § 1406(a) permits transfer of an action commenced in the wrong judicial district to the proper district in the interest of justice." *Grill v. Walt Disney Co.*, 683 F. Supp. 66, 69 (S.D.N.Y. 1988) (citing *Goldlawr v. Heiman*, 369 U.S. 463, 466 (1962)). "Whether transfer is appropriate lies within the sound discretion of the district court." *Blauschild v. Tudor*, 31 F. Supp. 3d 527, 533 (E.D.N.Y. 2014).

Here, the case could have been brought in the Middle District of Florida because Korda resides in that district and the Firm's principal place of business is located in that district.[12] (Doc. 1 at 1, ¶¶ 3, 4.) And, because Vieira is a resident of Vermont, diversity of citizenship would be complete in Florida. *See Viko v. World Vision, Inc.*, No. 2:08-CV-221, 2009 WL 2230919, at *18 (D. Vt. July 24, 2009).

---

[12] The Court takes judicial notice of the fact that Korda and the Firm are located in Naples, Florida, which is in the jurisdiction of the U.S. District Court for the Middle District of Florida. Fed. R. Evid. 201(f); *see Bulova Watch Co. v. K. Hattori & Co.*, 508 F. Supp. 1322, 1328 (E.D.N.Y. 1981) ("Judicial notice may be resorted to on a motion to dismiss for lack of jurisdiction.").

Moreover, the Court finds that the interests of justice compel transfer of this case rather than dismissal. It does not appear that Vieira unreasonably sought venue in Vermont, and he did not do so in bad faith. Instead, he commenced this action in Vermont because he is a Vermont resident seeking redress in the most convenient forum to him. Furthermore, neither Korda nor the Firm will be prejudiced by transfer of this case because they have actual notice of the litigation and reside in the Middle District of Florida. *See Am. Wholesalers Underwriting, Ltd. v. Am. Wholesale Ins. Grp., Inc.*, 312 F. Supp. 2d 247, 259–60 (D. Conn. 2004) (concluding transferring case to district where defendants resided would not prejudice defendants who had actual notice of the litigation).

Finally, although Korda and the Firm request a dismissal of this action, (Doc. 6 at 12), and neither party requested a transfer under 28 U.S.C. § 1406(a), the decision to transfer an action lies within the discretion of the Court. *Blauschild*, 31 F. Supp. 3d at 533; *see also Schiller v. Mit-Clip Co.*, 180 F.2d 654, 655 (2d Cir. 1950). Accordingly, the Court concludes that the case should be transferred to the U.S. District Court for the Middle District of Florida.

## Conclusion

Based on the foregoing, Korda and the Firm's joint Motion to Dismiss for Lack of Jurisdiction (Doc. 6) is DENIED and the Clerk of Court shall TRANSFER this case to the U.S. District Court for the Middle District of Florida pursuant to 28 U.S.C. § 1406(a). Further, given Vieira's failure to establish a prima facie showing of this Court's personal jurisdiction over either Korda or the Firm, the Court DENIES Vieira's dilatory request for jurisdictional discovery. *See Marine Midland Bank, N.A.*

*v. Miller*, 664 F.2d 899, 904 (2d Cir. 1981) ("In deciding a pretrial motion to dismiss for lack of personal jurisdiction a district court has considerable procedural leeway."); *see also* 4 Wright & Miller, Fed. Prac. & Proc. Civ. § 1067.6 (4th ed.) ("A court need not hold an evidentiary ruling to allow the plaintiff to present evidence supporting personal jurisdiction when the specific allegations of the plaintiff even if fully credited do not make a prima facie showing of jurisdiction.").

      Dated at Burlington, in the District of Vermont, this 8th day of May 2018.

/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge